UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| FLO FREE LLC et al., Plaintiffs, -against- THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA and PARK AVENUE SECURITIES, LLC, Defendants. | : | 25 Civ. 7318 (LGS) **<u>OPINION & ORDER</u>** |

LORNA G. SCHOFIELD, District Judge:

Plaintiffs Flo Free LLC ("Flo Free"), Currence, Inc. ("Currence" and, together with Flo Free, "Plaintiff Companies") and David Mozeika bring this action against Defendants The Guardian Life Insurance Company of America ("Guardian") and Park Avenue Securities, LLC ("PAS"), alleging that Defendants misappropriated the "Flo" software Mozeika developed while working for Guardian. The First Amended Complaint (the "FAC"), which is the operative complaint, asserts seven claims. Defendants move to dismiss all claims against PAS and all but one claim against Guardian pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the following reasons, the motion is granted in part and denied in part.

## I. BACKGROUND

The following facts are taken from the FAC and the exhibits attached to it. *See Brill v. Ulster County*, 2026 WL 3399063, at *2 (2d Cir. Nov. 10, 2026) (noting that when considering a motion to dismiss, a court may consider "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference").[1] These facts are

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

assumed to be true for purposes of this motion and are construed in the light most favorable to Plaintiffs as the non-moving parties. *See Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023).

**A. The Parties and Their Relationships**

Plaintiff David Mozeika was employed by Defendants from 2004 to 2023 as a Guardian financial advisor and a PAS registered representative. He is the founder and majority owner of Flo Free and Currence. Defendant Guardian is a mutual insurance company. Defendant PAS is a wholly owned subsidiary of Guardian and serves as its retail broker-dealer and registered investment advisor.

While working as a financial advisor, Mozeika developed an approach to client savings whereby a client's entire paycheck was deposited into a brokerage account at PAS (the "reservoir account") and invested by default, with the client electing to withdraw funds for expenses. This approach differed from Guardian's traditional approach, whereby a client deposited only funds the clients elected to invest. To implement the new approach, Mozeika used third-party financial planning software to develop client-specific investment plans, but he found that the software was labor-intensive and time-consuming.

In 2016, Mozeika co-founded Flo Free with Vincent M. D'Addona, another former Guardian financial advisor who is not a party in this case. Mozeika was the ultimate owner of 80% of Flo Free, and D'Addona owned 20%. Flo Free's purpose was to develop new wealth-building software better suited to Mozeika's approach. In 2017, Flo Free engaged a third-party developer, Defined Logic, LLC ("Defined Logic"), to build the software, which would be called "Flo." Defined Logic was the "sole custodian" of the proprietary technology that it developed for Flo Free.

**B. Agreements Among the Parties**

Between 2018 and 2022, Plaintiff Companies and Defendants, in varying configurations, executed five agreements restricting the disclosure of confidential information: the 2018 Non-Disclosure Agreement ("NDA"), the 2018 Acknowledgment ("Acknowledgment"), the 2019 NDA, the 2019 User Authentication Services Agreement ("Authentication Agreement") and the 2022 NDA (collectively, the "Protective Agreements"). The Protective Agreements prohibited Defendants from disclosing or using Flo Free's confidential information without authorization and, in the case of the Authentication Agreement, from copying or reverse engineering the "FLO service," which the Authentication Agreement defines as "the [Flo Free] Applications and related website and any related documentation, materials and information, including any data, results, recommendations or information from use of the foregoing."

Under the 2018 NDA and Acknowledgment, 2019 NDA and 2022 NDA, Plaintiff Companies disclosed to Defendants "Confidential Information," which was defined broadly as all confidential or proprietary information relating to Flo Free and its controlled affiliates, including, but not limited to, a detailed list of examples relating primarily to Flo Free's business and the development of the Flo software. Among other requirements, Defendants were required to hold Confidential Information in strict confidence, notify Plaintiff Companies of any authorized disclosure and return or destroy Confidential Information upon termination. The confidential information Plaintiff Companies disclosed in reliance on these promises included eleven documents or categories of documents, which are detailed in the FAC.

Under Guardian's policies, Mozeika was prohibited from seeking funding from third parties. In 2018, Guardian agreed to lend Flo Free up to $825,000 to support development pursuant to a Promissory Note Purchase Agreement (the "Note"). The Note included a 24-month

exclusivity period barring Flo Free from marketing its products and services to Guardian's competitors. The Note further provided that, while Flo Free would share information with Guardian related to Flo Free's "technology roadmap" and Guardian would communicate its "preferences" to Flo Free regarding that roadmap, Flo Free "will be the owner of all intellectual property rights associated with the Technology and related product and service offerings, including with respect to any input and feedback provided by Guardian." Mozeika and D'Adonna each personally guaranteed Flo Free's payment obligations under the Note.

**C. Flo Free's Growth**

In July 2019, Flo Free accepted its first customer and began earning revenue. After Mozeika and D'Addona's success with the new approach became known at Guardian, numerous Guardian advisors signed up for licenses to use the Flo software. Flo Free trained Guardian and PAS personnel on how to pitch clients to open PAS accounts and route their paychecks to those accounts and on best practices for account openings and sales. Flo Free hosted training sessions for Guardian personnel at conferences and symposia and virtually.

Between July 2019 and 2022, Flo Free's business accelerated, and thousands of clients and agents paid Flo Free subscription fees to use Flo. Flo Free's annual revenue grew from approximately $200,000 in 2020 to over $1 million in 2022. Flo Free's primary sources of revenue were (i) license fees from Guardian advisors and agents ($150 per month for each licensed advisor and $1,000 to $1,500 per month for each general agent) and (ii) account fees from clients ($120 per year). Total balances in Flo Free's own clients' reservoir accounts grew from nearly $50 million by the end of 2020 to $150 million by 2022. Total cumulative deposits in reservoir accounts for other Guardian financial advisors and agents using Flo reached approximately $2 billion by April 2023.

Flo Free's technology and approach were highly beneficial to Guardian. Guardian clients improved their investment and savings rates. Guardian's advisors significantly improved their productivity by selling Guardian insurance and investment products. Larger deposits sat in PAS reservoir accounts, generating interest income to PAS in amounts greater than the interest paid to the account holders. And Guardian saw increased retention of its own financial advisors.

As Flo Free grew between July 2019 and mid-2022, its market research indicated that its platform would be better if integrated with bank accounts rather than PAS brokerage accounts. Banking transactions are quicker than brokerage transactions, and more agents could use Flo if no securities license was necessary to execute the transactions. However, PAS is a retail broker dealer and registered investment advisor, not a bank, and "lacked necessary technical capabilities to make the transition." Accordingly, Flo Free engaged new vendors and invested in improving its technology and capabilities so that Flo Free "[c]ould custody client assets at third-party banks rather than [PAS]." Mozeika demonstrated this new technology during regular meetings with Michael Ferik, Guardian's Head of Individual Markets, and discussed the new structure with Guardian's head of compliance and PAS's attorneys to determine "whether it was compliant for Guardian advisors to use." "In response, Guardian approved of the proposed approach." Thereafter, Flo Free rebranded itself as Currence and invested millions of dollars in developing a new version of its technology that would link directly to client bank accounts at a third-party bank.

**D. Discussions Among the Parties**

Throughout their relationship, the parties discussed integrating Flo with Guardian's systems and platform, including deploying Flo at PAS, creating Guardian-hosted accounts for Flo clients and negotiating a commercial arrangement to make Flo's services more accessible to

Guardian's advisors. During a period in 2022, Mozeika and Ferik held weekly meetings to discuss deeper integration between Flo Free/Currence and Guardian in which Mozeika shared financial models, costs and software demonstrations. Ferik told Mozeika that Guardian "likes the technology." In June 2022, Mozeika and Guardian discussed options for furthering the partnership between the companies, including a commercial deal between Guardian and Currence and a potential acquisition by Guardian. On July 5, 2022, Currence was incorporated, and in the same month, Currence, Guardian and PAS signed the 2022 NDA. In a July 20, 2022, email, Ferik stated that Guardian's goal for Currence included "integration with LBS," Guardian's own digital suite of financial planning technologies known as "Living Balance Sheet" or "LBS."

On September 27, 2022, at a meeting in which Mozeika expected to discuss integrating Currence with PAS, a Guardian representative stated that Guardian wished to purchase Flo. In December 2022, Guardian sent Flo Free a non-binding letter of intent ("LOI") to acquire Flo, contingent on due diligence that would include a code walk-through. The LOI proposed a $6 million purchase price structured as an upfront closing payment and a second payment upon satisfaction of certain performance milestones after the acquisition. The FAC alleges that the offer significantly undervalued the company and was not made in good faith. The LOI was never executed.

**E. Alleged Copying and Interference**

Around the time of the LOI, Mozeika reviewed a module, called Cash Flow Allocation Pro ("CFAP"), within LBS, Guardian's own financial planning platform. CFAP had been revamped from LBS's previous "Cash Flow Allocation" module and replicated features of Flo, including the ability to designate a target balance, create a destination to receive income prior to

sending funds to a checking account, categorize transactions and automatically generate client-specific metrics. These features were unique to Flo and the result of years of confidential research and development efforts. Guardian had access to Flo Free's confidential information because of their partnership, enabling Guardian to copy Flo's architecture and functionalities. The FAC alleges, on information and belief, that Guardian shared Plaintiffs' confidential information with a third-party developer, eMoney Advisor, LLC ("eMoney"), to build the CFAP module.

After Mozeika first confronted Guardian about the alleged copying in January 2023, Guardian took several steps that interfered with Plaintiffs' business, including directing agents and advisors to use the LBS module instead of Flo, scheduling a competing event at the same time as Plaintiffs' conference for Guardian agents and representatives and announcing to Guardian personnel that Flo was "going away." Guardian also refused to restructure repayment of the 2018 Note as previously discussed, putting financial pressure on Plaintiffs. When Mozeika confronted Ferik about the alleged copying in April 2023, Ferik did not dispute the accusation and responded, "I thought you would take the money," referring to the $6 million offer in the LOI.

On May 1, 2023, Mozeika resigned from Guardian and PAS. The same day, he had a recorded call with Neal Brincefield, the head of LBS, in which Brincefield stated that Guardian had long intended to copy Flo, acknowledged that Defendants had fostered a hostile environment against Mozeika and conceded that Defendants had lied to Mozeika and stolen his business.

## II. STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009); *accord Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[] . . . claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *United States ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 139 (2d Cir. 2024). Under Rule 12(b)(6), a court "accept[s] as true all nonconclusory factual allegations in the complaint and draw[s] all reasonable inferences in the Plaintiffs' favor." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). A court "need not consider conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021).

## III. DISCUSSION

The FAC asserts seven claims. The following claims are by Plaintiff Companies against all Defendants: (i) trade secret misappropriation under the Defend Trade Secrets Act (the "DTSA"), (ii) trade secret misappropriation under the New Jersey Trade Secrets Act (the "NJTSA"), (iii) breach of contract, (iv) breach of the implied covenant of good faith and fair dealing, (v) tortious interference with business relations under New Jersey common law and (vi) unfair competition under New Jersey common law. The FAC also asserts violations of the New Jersey Wage Payment Law (the "NJWPL") by Plaintiff Mozeika against Defendant Guardian.

Defendants move pursuant to Rule 12(b)(6) to dismiss all claims except the breach of contract claim against Guardian. The motion is granted in part and denied in part.

### A. Trade Secret Misappropriation

Defendants' motion to dismiss the state trade secret misappropriation claim (Count II) is granted. Defendants' motion to dismiss the federal trade secret misappropriation claim (Count I) is denied.

#### 1. State Law

##### a. Choice of Law

The FAC asserts a state trade secret misappropriation claim under the NJTSA. A threshold question, about which the parties disagree, is whether New York or New Jersey law applies to the state law misappropriation claim. A federal court exercising diversity jurisdiction applies the choice-of-law rules of the state in which the court sits. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115 (2022). "Under New York's conflict of laws approach, the first step is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Asinga v. Gatorade Co.*, 182 F.4th 222, 227 (2d Cir. 2026). "A conflict exists if the applicable law from each jurisdiction provides different substantive rules." *Id.* If there is a conflict, "[i]n tort cases, New York applies the law of the state with the most significant interest in the litigation." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021). "If there is no conflict, and New York law is among the relevant choices, New York courts are free to apply it." *Asinga*, 182 F.4th at 227.

Although the elements of trade secret misappropriation under New York, New Jersey and federal law (the DTSA) are substantially the same,[3] a conflict exists between New Jersey and

---

[3] *See Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 n.11 (3d Cir. 2021) (DTSA and NJTSA); *Shrink Packaging Sys. Corp. v. Kist*, No. 22 Civ. 4967, 2023 WL 5664733, at *7 (D.N.J. Sep. 1, 2023) (DTSA and NJTSA); *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (DTSA and New York law); *Talenthub Worldwide, Inc. v. Talenthub Workforce, Inc.*, No. 24 Civ. 6264, 2025 WL 2578385, at *4 (S.D.N.Y. Sep. 5, 2025) ("In assessing DTSA claims, courts in this Circuit often look to New York trade secret law.").

New York law because New York law precludes trade secret claims that are duplicative of contract claims, while New Jersey law does not. Under New Jersey law, NJTSA claims can proceed along with contractual claims because the NJTSA imposes duties, "which can be enforced separately and apart from contractual obligations." *See Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002); N.J. Stat. Ann. § 56:15-2 (defining "improper means" to include "breach of an express or implied duty to maintain the secrecy of, or to limit the use or disclosure of, a trade secret"); *Allstate Life Ins. Co. v. Stillwell*, No. 15 Civ. 8251, 2019 WL 2743697, at *11 n.5 (D.N.J. May 16, 2019) ("The NJTSA creates liability where trade secrets are acquired through the breach of an express duty, *i.e.*, through a contractual duty."). Under New York common law, by contrast, "when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in . . . torts . . . are generally precluded." *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) (summary order) (New York law); *see, e.g.*, *Richmond Glob. Compass Fund Cap. Mgmt. GP, LLC v. Nascimento*, 203 N.Y.S.3d 606, 607 (1st Dep't 2024) (affirming dismissal of trade secret claim as duplicative of contract claim); *Linkable Networks, Inc. v. Mastercard Inc.*, 125 N.Y.S.3d 92, 93 (1st Dep't 2020) (same). "Misappropriation claims therefore cannot lie where they are simply a restatement of a breach of contract claim" and will accordingly be "dismissed as duplicative where the defendant has signed [a contract] that prohibits misuse or sharing of trade secrets." *My Mavens, LLC v. Grubhub, Inc.*, No. 20 Civ. 4657, 2023 WL 5237519, at *24 (S.D.N.Y. Aug. 13, 2023) (New York law).

Because of the conflict between New Jersey and New York law, it is necessary to proceed to the second step of the choice-of-law analysis and determine which state has the greater interest

in "the outcome of th[is] particular litigation." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 642 (2d Cir. 2016) (quoting *In re Liquidation of Midland Ins. Co.*, 947 N.E.2d 1174, 1179 (N.Y. 2011)). "In deciding how to weigh interests, New York distinguishes between conduct-regulating rules and loss-allocating rules" and applies the law of the place of the tort to conduct-regulating rules. *Kinsey*, 991 F.3d at 176. A rule prohibiting misappropriation can be viewed as conduct-regulating, making the place where the misconduct -- i.e., the misappropriation -- occurred the most significant contact. *Cf. id.* at 176-77 (considering defamatory or libelous conduct to be conduct-regulating and applying the law of the defendant's domicile). "In trade secret cases the Second Circuit and its district courts have often used the locus of the misappropriation to determine the locus of the tort and the state with the greatest interest." *Medidata Sol., Inc. v. Veeva Sys., Inc.*, No. 17 Civ. 589, 2021 WL 467110, at *12 (S.D.N.Y. Feb. 9, 2021) (collecting cases); *see, e.g.*, *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (citing *Cousins v. Instrument Flyers, Inc.*, 376 N.E.2d 914, 915 (N.Y. 1978) (per curiam)) (applying New York law to trade secret claim because "the misappropriation, if any, apparently took place in New York, at [defendant's] offices").

New York has the greater interest in this case. Defendant has its principal place of business in New York, and any misappropriation would have originated in New York. The New York choice-of-law clauses in the parties' NDAs, while inapplicable to non-contractual claims, show that the parties reasonably expected New York law to govern the question of confidentiality between them. *See Fedders Corp. v. Haier Am. Trading, LLC*, No. 00 Civ. 5583, 2002 WL 519733, at *4 (S.D.N.Y. Apr. 4, 2002) (using the location where a confidentiality agreement was signed as a factor in the interest analysis); *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 283

(N.Y. 1993) (noting that "the protection of reasonable expectations" "play[s] a role in choice of law").

The FAC asserts New Jersey's interest based on Plaintiffs' and Defined Logic's location in New Jersey. Because Plaintiffs are located in New Jersey, their conduct and injury occurred there. Defined Logic's location in New Jersey means that Plaintiffs' trade secrets were developed there and reside on the company's servers there. Nevertheless, New York has the greater interest in the misconduct that is the basis for the claim under the conduct-regulating framework articulated in *Kinsey*. *See Kinsey*, 991 F.3d at 176. New York has expressed that interest with a rule that requires parties with a contractual relationship to resolve their misappropriation dispute pursuant to their agreement rather than general tort principles, as discussed above.

Plaintiff suggests that a choice-of-law analysis is "fact-intensive" and therefore premature on a motion to dismiss. This argument is unpersuasive when, as here, the analysis assumes the truth of the facts alleged in the complaint and the FAC details the alleged contacts with the competing jurisdiction.

### b. Application -- Trade Secret Misappropriation Under New York Law

The FAC fails to state a claim for trade secret misappropriation under New York law because the claim is duplicative of the claim for breach of contract. The FAC alleges that Defendants breached the Protective Agreements, including the NDAs, by misusing Plaintiffs' "Confidential Information" to copy Plaintiff Companies' technology and business. The NDAs, which are incorporated by reference in the other Protective Agreements, all define "Confidential Information" to include trade secrets. The FAC's claim for trade secret misappropriation under state law asserts that Plaintiff Companies possessed trade secrets, which Defendants used

without Plaintiff Companies' consent. Because this is "simply a restatement of [Plaintiffs'] breach of contract claim," *Cereus Prod. Dev., Inc. v. Boom LLC*, No. 14 Civ. 4292, 2015 WL 3540827, at *7 (S.D.N.Y. June 5, 2015), the claim for trade secret misappropriation under state law is dismissed. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987) (tort claims "must spring from circumstances extraneous to, and not constituting elements of, [a] contract"); *accord Sterling Select II Advisory, LLC v. Argus Info. & Advisory Servs., Inc.*, No. 23 Civ. 2939, 2026 WL 734047, at *16 (S.D.N.Y. Mar. 16, 2026). Although the FAC asserts that Defendants had statutory duties "independent of their contractual duties," they were the same duties not to steal Plaintiffs' trade secrets.

**2. Federal Law**

The motion to dismiss the claim for trade secret misappropriation under federal law is denied. To state a claim for trade secret misappropriation under the DTSA, a complaint must allege facts showing that (i) the plaintiff possessed a trade secret and (ii) the defendant misappropriated the trade secret. 18 U.S.C. § 1836(b)(1). The DTSA defines the term "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" if (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3). "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the trade secret, his property right is extinguished." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 182 (2d Cir. 2023). Misappropriation includes the "use of a trade secret of another without express or implied

consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5).

**a. Possession of Trade Secrets**

The FAC adequately pleads that Plaintiffs possessed trade secrets. The FAC identifies several trade secrets, including: proprietary backend software, software architecture, source code, demos and prototypes, user journey documents, training materials, product designs, policies, business plans, pitch methods, a business proposal document, a go-to-market strategy and execution plan reflected in a brand and launch proposal document, a cost-structure and pricing model and proprietary methods developed by Plaintiff Companies to automate cash flow modeling and analysis. The FAC ties several of the alleged trade secrets to specific documents, such as "User Journey" documents, "Sprints" prepared by Defined Logic, a "System Design" document, a "Flo Platform Development" document, a "Flo Data Requirements" spreadsheet, a "Flo Information Security Third Party Requirements" spreadsheet, a "Software Development Life Cycle" document and a "Change Management Document." The FAC also cites the 2019 NDA to identify additional trade secrets, such as a business architecture schematic and documents relating to penetration testing and source code reviews. The FAC separately acknowledges that certain components, including Mozeika's general savings strategy, Flo's frontend software and information disclosed in patent applications, are not among the claimed trade secrets.

These allegations plead the existence of trade secrets with sufficient specificity. *See Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 802 (2d Cir. 2023) (concluding that "a reasonable jury could have determined that the asserted software trade

secrets were in fact trade secrets" where a fact witness "identified the trade secrets by name, described them in detail, tied them to specific documents or source code, and communicated that [the software developer] kept them confidential"); *Dumbo Moving & Storage, Inc. v. Piece of Cake Moving & Storage LLC*, No. 22 Civ. 5138, 2023 WL 5352477, at *7 (S.D.N.Y. Aug. 21, 2023) (concluding that a complaint sufficiently identified purported trade secrets where it "identifie[d] the software and describe[d] its function in detail," "state[d] that the software was created using knowledge" that the plaintiff "acquired through years in the . . . business" and "[went] on to identify some of its specific features").

The FAC also sufficiently describes the "reasonable measures [that Flo Free undertook] to keep such information secret." *See* 18 U.S.C. § 1839(3). The FAC explains, and attaches, the Protective Agreements Plaintiffs entered to protect their confidential and trade secret information. The FAC further alleges that Plaintiffs made extensive efforts to maintain the secrecy of their trade secrets beyond entering the Protective Agreements, such as executing contracts that limited the use and dissemination of their trade secrets by Defined Logic and its agents, storing confidential information on secure servers and restricting access to Plaintiff Companies' physical premises.

The FAC also alleges how the trade secrets "derive[] independent economic value . . . from not being generally known." *See id.* The FAC details the history of Flo's development over several years, which involved significant investments by Plaintiffs of time, resources and capital. The FAC describes economic value that Plaintiffs derived, including through significant revenues and revenue growth, as a result of implementing and protecting the trade secrets, which would require years of development, millions of dollars and thousands of hours of labor to duplicate. *See Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 381 (S.D.N.Y. 2020)

(holding that a trade secret claim was adequately pled where the protective steps included using a firewall and log-in and password protection and the company "expended considerable resources, both financial and in personnel time, developing this non-public information, which is an extremely valuable asset").

Defendants argue that the FAC does not describe the trade secrets with sufficient specificity. Defendants cite *FXRobott LLC v. Noetiq Research Inc.*, No. 25 Civ. 2264, 2025 WL 1874888 (S.D.N.Y. July 8, 2025), in which the court held that the following description did not identify a trade secret with sufficient specificity:

> Software, Documentation, Specifications, and other documents, work product, and materials related thereto, that Defendants provide to Plaintiffs under the [relevant agreements], together with all ideas, concepts, processes, and methodologies developed in connection therewith, whether or not embodied therein.

*Id.* at *12. Defendants' argument is unconvincing because the FAC identifies the alleged trade secrets in this case with much greater specificity. The alleged trade secrets in *FXRobott* were defined by reference to a broad one-sentence definition of "Work Product" that appeared in the parties' contract. *Id.* By contrast, the trade secrets here are detailed on several pages of the FAC, which list specific categories of information, software, methods and technology that, in many instances, are tied to specific documents.

Defendants argue that Mozeika has publicized most of the purported trade secrets, so they are not secrets as a matter of law. Defendants argue specifically that Flo has been on the market since 2019, that its frontend software cannot be a trade secret, that its launch timeline, marketing and pricing are obvious and that Mozeika disclosed training materials and pitch materials in various presentations and trainings. Defendants argue that "the architecture or design of a software system that is obvious or easily duplicated once it is seen by the public cannot, as a matter of law, constitute a trade secret." *Hayden v. Int'l Bus. Machs. Corp.*, No. 21 Civ. 2485,

2025 WL 1697021, at *17 (S.D.N.Y. June 17, 2025). These arguments are unpersuasive. First, Defendants quote *Hayden* out of context. The quote Defendants excerpt is preceded by: "Courts in this Circuit have held that source code or technical details of a software architecture can be trade secrets if they are not easily copied or ascertainable by inspection of the program." *Id.* at *16. The non-obvious portions of the Flo software can retain trade secret protection even after the product is launched for public use. Second, the fact that Mozeika provided product demonstrations and training does not mean that he disclosed the specific trade secrets asserted in the FAC.

Defendants also argue that Plaintiffs' patent applications publicly disclosed Flo's technical details. That argument is unavailing. The FAC lists the items constituting the trade secrets in this case and expressly excludes information disclosed in various design and utility patent applications filed by Plaintiff Companies. The FAC adequately pleads that Plaintiffs possessed trade secrets.

**b. Misappropriation**

The FAC sufficiently pleads that Defendants misappropriated Plaintiffs' trade secrets. Misappropriation can be established by showing a defendant used the trade secrets in "breach of an agreement." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (New York law); *accord Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 280 (S.D.N.Y. 2021) (New York law). Because the NDAs gave rise to a duty of secrecy and limited use, and Defendants were aware of the NDAs, Defendants' allegedly unauthorized use or disclosure of the trade secrets was misappropriation under the DTSA. *See* 18 U.S.C. § 1839(5). "In trade secret misappropriation cases where Defendants created products allegedly utilizing the trade secrets, copying can be established by showing that a defendant had access to

the alleged trade secrets and that there is a substantial similarity between the original product which embodied those trade secrets and the alleged copy created by the defendant." *Town & Country Linen Corp.*, 556 F. Supp. 3d at 280.

The FAC alleges that Plaintiffs, relying on the Protective Agreements, shared all aspects of their technology with Defendants at their request and that Plaintiffs provided Guardian descriptions of Flo's functionality, outlines of Flo's architecture, a product development roadmap and timeline, proprietary usage and productivity data, a system design document, financial information and software demonstrations. The FAC also alleges that Guardian's CFAP module duplicated specific features of Flo, that such features were unique to Flo and that Guardian was able to copy Flo's architecture and functionalities because Guardian had access to those trade secrets through its partnership with Plaintiffs. The FAC also alleges, upon information and belief, that Guardian disclosed Plaintiffs' trade secrets to eMoney to create CFAP, in breach of Defendants' confidentiality obligations under the Protective Agreements. Together, these allegations adequately plead that Guardian misappropriated Plaintiffs' trade secrets by using or disclosing those trade secrets to develop the CFAP module, which duplicated several features of Flo.

Defendants argue that the FAC does not adequately allege misappropriation because the commonalities between LBS's CFAP module and Flo are industry-standard, public-facing functionalities and basic automation capabilities. Defendants further contend that the FAC's allegation, upon information and belief, that Guardian shared confidential information and trade secrets with eMoney is conclusory and without supporting facts. These arguments are unavailing. As noted above, and construing the facts in the light most favorable to Plaintiffs as the non-moving parties, copying may be inferred from access and substantial similarity. The

substantial similarities between CFAP and unique features of Flo also support the reasonable inference that Guardian disclosed Plaintiffs' trade secrets to eMoney in order to develop the CFAP module.

**B. Implied Covenant of Good Faith and Fair Dealing**

The claim for breach of the implied covenant of good faith and fair dealing (Count IV) is dismissed.

The implied covenant claim is governed by New York law. Ordinarily, the law governing the implied covenant is the same law that governs the express provisions of the relevant contract, which here would be the law specified in the contracts' respective choice-of-law provisions.[4] *SING for Serv., LLC v. DOWC Admin. Servs., LLC*, No. 20 Civ. 5617, 2022 WL 36478, at *19 (S.D.N.Y. Jan. 3, 2022); *Comprehensive Habilitation Servs., Inc. v. Com. Funding Corp.*, No. 05 Civ. 9640, 2009 WL 935665, at *10 n.14 (S.D.N.Y. Apr. 7, 2009). Here, however, the claim is assessed under New York law because the parties in their briefing implicitly agree that New York law applies. *See Ezrasons, Inc. v. Travelers Indemnity Co.*, 89 F.4th 388, 394 n.5 (2d Cir. 2023) ("[I]mplied consent is sufficient to establish the applicable choice of law.").

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance," which "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Cordero v. Transamerica Annuity Servs. Corp.*, 211 N.E.3d 663, 670 (N.Y. 2023). Courts "will infer that contracts include any promises which a reasonable person in the position of the promisee would be justified in understanding were included at the time the contract was made." *Id.* "No obligation can be implied, however, which would be inconsistent with other

[4] The 2018 NDA and Acknowledgment are governed by Delaware law. The 2019 NDA, 2022 NDA and Authentication Agreement are governed by New York law.

terms of the contractual relationship." *Id.* "[A] party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists." *Id.* "Additionally, for a plaintiff to plead a valid cause of action for breach of the covenant of good faith, a plaintiff must allege facts sufficient to demonstrate that the plaintiff "reasonably understood" the contract or contractual provision at issue to state a duty to take or refrain from taking a particular action. *Id.* at 670-71. "[U]nder New York law, the covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248 (2d Cir. 2020).

The FAC alleges that Defendants breached the implied covenant under the Protective Agreements by secretly developing a competing platform despite repeatedly assuring Plaintiffs that they would not do so. The FAC alleges that in reliance on these assurances, Plaintiffs shared confidential information and trade secrets with Guardian, continued investing millions of dollars and thousands of hours into product development and granted Guardian expansive access to software and performance data. The FAC argues that Guardian's purchase offer was a "sham" at a fraction of Flo Free's value, and, when that offer was rejected, Guardian immediately launched a competing platform that copied Flo's technology, business model and functionality. The FAC argues that Defendants exploited the access and trust conferred by the Protective Agreements to reap the fruits of those agreements at Plaintiffs' expense.

These facts are insufficient to support a claim for breach of the implied covenant. To the extent the claim is that Defendants used Flo Free's confidential information to create a competing product, such conduct would be an express breach of the use provisions of the NDAs, which limit use of the information to evaluating the technology and possible transactions and

monitoring the loan between the parties. If the claim is that Guardian did not make a bona fide offer to purchase Flo Free, that claim is expressly barred by the 2018 and 2022 NDAs, which state that they do not commit or bind either party to enter into a business relationship or contract. If the claim is that Defendants created a competing product, contrary to oral assurances by Guardian representatives, that claim is inactionable as an implied agreement. All three NDAs contain a merger clause stating that they constitute the entire agreement between the parties and require that all modifications be made in writing. The 2018 and 2022 NDAs explicitly state that neither party may rely on their discussions or the provisions of confidential information as a commitment to act or not to act in any given manner. Although Plaintiffs note that the FAC quotes the Authentication Agreement, which prohibits Defendants from copying or reverse engineering Flo, that prohibition does not prohibit Defendants from creating a competing product without the benefit of Plaintiffs' proprietary information. To the extent the claim relies on Defendants' use of Plaintiffs' proprietary information, the claim is duplicative of the contract claim. For these reasons, the FAC fails to allege that Defendants breached any implied duty in the Protective Agreements. The implied covenant claim is dismissed.

### C. Tortious Interference with Business Relations

The FAC asserts a claim styled as "Tortious Interference with Business Relations," alleging violations of New Jersey Law (Count V). In substance, the claim alleges various ways that Defendants interfered with Plaintiffs' relations with General Agents and financial advisors who licensed and used the Flo product and with clients who received financial services using Flo, by inducing them to switch from Flo to Defendants' competing product. Defendants argue that New York law applies and that the claim fails because (i) the claim is duplicative of the contract claim of stealing Plaintiffs' confidential information to create a competing product and,

to the extent not duplicative, improperly gives rise to new affirmative duties, (ii) Guardian acted out of normal economic self-interest, which, as a matter of New York and New Jersey law, is not tortious interference, (iii) Guardian is not a third party to the business relations at issue and (iv) the FAC fails to plead with specificity the contract or relationship that was the subject of interference. Plaintiffs respond that the claim is sufficiently pleaded under New Jersey law by describing Defendants' concerted campaign to ruin Plaintiffs' business and arguing that at least as to General Agents and Field Representatives, the interference was with third-party contracts.

The motion to dismiss the claim of tortious interference with business relations is denied.

**1. Choice of Law**

The FAC asserts a claim for "Tortious Interference with Business Relations." Under New York law, tortious interference comprises two distinct causes of action: tortious interference with existing contractual relations and tortious interference with prospective business relations. *See Catskilll Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (New York law) (distinguishing claims). The FAC alleges that "Plaintiff Companies had protected business relations with the various General Agents and financial advisors who licensed and used their technology, as well as the clients who received financial services with the aid of such technology," and with "Jason Doviak, who assisted with the development of Plaintiff Companies' technology and intellectual property and with their marketing pursuant to a consulting agreement." Because the FAC alleges no breach of third-party contracts, the claim is construed as one for tortious interference with prospective business relations. The elements of tortious interference under New Jersey law are the same for existing and prospective relations. *See Matrix Distribs., Inc. v. Nat'l Ass'n of Boards of Pharmacy*, 34 F.4th 190, 200 (3d Cir. 2022); *Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001) ("Not only does the law

[of tortious interference] protect a party's interest in a contract already made, but it also protects a party's interest in reasonable expectations of economic advantage."); *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 38 (N.J. 1989).

New Jersey and New York law conflict on the tortious interference with business relations claim because New York requires a higher showing of culpability. Under New York law, a plaintiff must show that "the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015). Where, as here, a suit is based on interference with a nonbinding relationship (i.e., interference with future relations), "the plaintiff must show that defendant's conduct was not 'lawful' but 'more culpable,'" and "[t]he implication is that, as a general rule, the defendant's conduct must amount to a crime or an independent tort." *Carvel Corp. v. Noonan*, 785 N.Y.S.2d 359, 362 (N.Y. 2004); *see also 16 Casa Duse*, 791 F.3d at 262 (noting an exception to this rule where a defendant engages in conduct "for the sole purpose of inflicting intentional harm on plaintiffs"). A New Jersey tortious interference claim requires malice, which is defined to mean that "harm was inflicted intentionally and without justification or excuse." *Matrix Distribs.*, 34 F.4th at 200 (New Jersey law); *see also Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013) ("Under New Jersey law, a plaintiff must demonstrate interference with a contractual relationship that is knowing, intentional, and wrongful."). The New Jersey malice requirement is more flexible than New York's rule, even with the sole-purpose exception. New Jersey's rule can encompass a broader range of conduct that "transgresse[s] the rules of the game" or violates "generally accepted standards of common morality," even if the conduct is not independently unlawful. *See Lamorte Burns*, 770 A.2d at 1171 (explaining that malicious conduct can include dishonesty).

As between New York and New Jersey, the latter has a greater interest in the outcome of this litigation. Because tortious interference with contractual relations is a conduct-regulating rule, "the law of the locus jurisdiction applies." *Kinsey*, 991 F.3d at 176; *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992); *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 277 (S.D.N.Y. 2002). "[W]hen the defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 683 (N.Y. 1985). Because tortious interference requires damages, the place where Plaintiff suffered the injury determines the locus of the tort. *See Matrix Distribs.*, 34 F.4th at 200 ("A New Jersey tortious interference claim has four elements: (1) a protected interest, (2) malice, (3) a reasonable likelihood that the interference caused the loss of the prospective gain, and (4) resulting damages."). Plaintiff Companies are both headquartered in New Jersey, and the FAC alleges that Plaintiff Companies suffered damages, including reduced revenues and assets under management, that would be felt where Plaintiff is located. New Jersey is therefore the locus of the tort, and New Jersey law applies to the claim. *See* Restatement (Second) of Conflict of Laws § 145 (noting that "the place of business is the more important contact" in cases where the interest affected is "a business or financial one, such as in the case of . . . interference with contractual relations"); *Hidden Brook Air*, 241 F. Supp. 2d at 278.

**2. Application -- Tortious Interference Under New Jersey Law**

The parties' dispute boils down to two issues: (i) whether the FAC alleges conduct that is sufficiently tortious or was merely in Defendants' "normal economic self-interest" and (ii) whether the FAC sufficiently pleads interference with third-party contracts. The motion to

dismiss the tortious interference claim is denied because the answer to both of these questions is yes. The FAC adequately pleads a claim of tortious interference under New Jersey law.

Defendants argue that the FAC fails to allege "improper and illegal means" because Guardian acted out of normal economic self-interest when trying to acquire Flo on favorable terms after Flo established proof-of-concept for the technology and that Defendants can therefore not be found liable for tortious interference. That argument is unavailing. "Although competition may constitute a justification, a defendant claiming a business-related excuse must justify not only its motive and purpose, but also the means used." *Lamorte Burns*, 770 A.2d at 1171. The FAC alleges that Guardian interfered with Plaintiffs' business relations with various General Agents and financial advisors who licensed and used Plaintiffs' technology, as well as with clients who received financial services with the aid of such technology, by diverting these customers to a copycat platform engineered using Plaintiffs' confidential information. The FAC further alleges that Guardian interfered with Plaintiffs' business relations by scheduling competing conferences and depressing attendance at Plaintiffs' events, spreading false rumors that Flo Free was going out of business, blocking Flo emails and calendar entries from being received by Flo customers, directing agents to transition from Plaintiff Companies' services and engineering defection of Plaintiffs' employees. Because the FAC plausibly alleges interference by conduct that is "fraudulent, dishonest, or illegal," the malice element is satisfied. *See id.*; *id.* at 1172 (explaining that "taking . . . confidential and proprietary property and then using it effectively to target plaintiff's clients, is contrary to the notion of free competition that is fair").

Defendants argue that the tortious interference claim fails because Guardian is not a third party to the business relations at issue and because the FAC does not include sufficiently particular allegations of interference. These arguments are also unavailing. While it is

"fundamental" that a claim for tortious interference "be directed against defendants who are not parties to the relationship," *Printing Mart-Morristown*, 563 A.2d at 37; *accord D'agostino v. Appliances Buy Phone, Inc.*, No. A-2005-13T1, 2015 WL 10434721, at *9 (N.J. App. Div. Mar. 8, 2016), the FAC establishes that Plaintiff Companies had independent business relations with Guardian's general agents and financial advisors. The FAC alleges that Guardian operates under an independent agency system with "franchise-like" General Agencies and that Guardian was not providing licenses for Flo to its agents and advisors. Instead, the FAC alleges that thousands of Guardian advisors and agents individually paid subscription fees to use Flo, constituting independent business relations. The Authentication Agreement also provides that "any license, subscription or other rights granted to Advisors, Clients and General Agents with respect to the FLO service are independent of any agreements or arrangements between FLO and Guardian, [PAS] or other Affiliates of Guardian." This is sufficient at the motion-to-dismiss stage to allege that Guardian advisors and agents had independent business relationships with Plaintiffs separate from Plaintiffs' contractual relationship with Guardian.

The FAC contains sufficiently particular allegations of interference. To plead a tortious interference claim with the requisite specificity, a plaintiff must allege facts that show "some protectable right -- a prospective economic or contractual relationship." *Printing Mart-Morristown*, 563 A.2d at 37; *see also Am. Millenium Ins. Co. v. First Keystone Risk Retention Grp.*, 332 F. App'x 787, 790 (3d Cir. 2009) (New Jersey law) (indicating that, to plead a tortious interference claim with the requisite specificity, a plaintiff must be able to identify at least one specific customer that was lost or could have been acquired). The FAC identifies specific business relations with the various General Agents and financial advisors who licensed and used Plaintiffs' technology, as well as the clients who received financial services with the aid of such

technology. The FAC also alleges that Plaintiffs charged a $150 monthly subscription fee for each advisor and a $1,000 to $1,500 monthly fee for each General Agent, that Plaintiffs "charged each client an account fee of $120 per year" and that Defendants' interference with those relations resulted in increased account closings. These allegations are more specific than "the claimed loss of unknown customers," which, standing alone, cannot sustain a claim for tortious interference," *see Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) (New Jersey law), and sufficiently identify an economic interest deserving of protection. The claim for tortious interference is adequately pled.

**D. Unfair Competition**

The motion to dismiss the unfair competition claim (Count VI) is denied.

The FAC asserts a claim of unfair competition under New Jersey law. Defendant moves to dismiss the claim, citing New York law. A choice-of-law analysis is not required because the laws of New York and New Jersey do not conflict on any dispositive issue. *See Zervos v. Trump*, 94 N.Y.S. 3d 75, 88 (1st Dep't 2019) ("Absent a showing of a discernible difference in the laws of the two states, no choice of law analysis is necessary, and New York law is applicable.").

Defendants argue that the unfair competition claim should be dismissed as duplicative of the breach of contract claim. This argument is unavailing for two reasons. First, "[w]hen a defendant breaches its contract with a plaintiff, that defendant may also breach an independent duty in tort if the defendant goes beyond a mere breach of the contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff." *Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003); *accord Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 509 (S.D.N.Y. 2018); *Med-Metrix, LLC v. Boyce*, No. 17 Civ. 3400, 2017 WL 5162809, at *3 (D.N.J. Nov. 7, 2017) (denying motion to dismiss unfair competition claim because it was

"similar to the other claims involving misappropriation of confidential information, but relies on a different legal theory"). Here, the FAC alleges not only that Defendants violated the terms of the parties' contracts but also that Defendants used wrongful means, including deception, strategic misrepresentations and calculated concealment, to extract from Plaintiffs confidential information about the Flo technology. Accepting the FAC's allegations as true, the claim for unfair competition is not duplicative of the breach of contract claim. *See Bytemark*, 342 F. Supp. 3d at 509 (finding unfair competition claim nonduplicative where defendants "led [p]laintiff to disclose its valuable intellectual property, trade secrets, and other confidential information when [d]efendants had no intention of partnering with [p]laintiff" and then used plaintiff's trade secrets to "secure their own contracts"); *id.* at 509-10 (collecting cases).

Second, as discussed above, although Defendants do not move to dismiss the breach of contract claim, they do contest that the Protective Agreements were breached. Accordingly, the FAC may plead unfair competition in the alternative to breach of contract.

**E. NJWPL**

The motion to dismiss Mozeika's NJWPL claim (Count VII) is denied. Under the NJWPL, when an employee "leaves employment for any reason," the employer must pay the employee "all wages due . . . or in the case of employees compensated in part or in full by an incentive system, a reasonable approximation of all wages due." N.J. Stat. Ann. § 34:11-4.3. Commissions are "wages" under the NJWPL. *Musker v. Suuchi, Inc.*, 331 A.3d 900, 906 (N.J. 2025); *see also* N.J. Stat. Ann. § 34:11-4.1 ("Wages means the direct monetary compensation for labor or services . . . where the amount is determined on a time, task, piece, or commission basis . . . .").

The FAC alleges that Mozeika earned and was entitled to commissions for policies that were renewed by his clients. The FAC further alleges that since Mozeika's termination, Guardian has withheld renewal commissions on policies that Mozeika sold and that were renewed. These facts are sufficient to state a claim. Defendants' argument that Mozeika is not entitled to the claimed commissions is unavailing at this stage of the litigation when the facts alleged are presumed to be true. *See Herrera*, 84 F.4th at 113; *Wagner v. Gunton Corp.*, No. 25 Civ. 11963, 2026 WL 969284, at *5 (D.N.J. Apr. 10, 2026) (declining to dismiss NJWPL claim where parties disputed whether commissions were actually due because "factual issues concerning the nature of the compensation structure and the point at which commissions vested . . . are not appropriately resolved on a motion to dismiss").

**F. Claims Against PAS**

The motion to dismiss all claims against PAS is granted. Rule 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 "does not require a claimant to set out in detail the facts upon which he bases his claim," but a complaint must give each defendant fair notice of "what the plaintiff's claim is and the grounds upon which it rests." *Bensch v. Est. of Umar*, 2 F.4th 70, 78 (2d Cir. 2021) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

The FAC fails to satisfy this "minimum standard," relying on group pleading to "lump[] all the defendants together in each claim and providing no factual basis to distinguish their conduct." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order); *accord Ortiz v. Consol. Edison Co. of N.Y., Inc.*, 801 F. Supp. 3d 260, 293 (S.D.N.Y. 2025) ("[I]t is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes and that Rule 8 is violated where a plaintiff, by engaging in group pleading,

fails to give each defendant fair notice of the claims against it."). The FAC asserts claims against "Defendants" jointly and alleges that "Guardian and PAS" together engaged in unfair competition, but the FAC does not identify any wrongful conduct committed by PAS specifically. These undifferentiated allegations, even where they refer to PAS by name, do not adequately "identify which defendant is alleged to be responsible for which alleged violations." *See Atuahene*, 10 F. App'x at 34 (affirming dismissal of complaint where plaintiff "replaced the allegations against 'the defendants' with the name of all of the defendants" but did not further differentiate between the defendants to identify the factual basis for its legal claims); *see also Thompson v. Lemon*, No. 23 Civ. 2102, 2026 WL 2516943, at *4 (S.D.N.Y. Aug. 26, 2026) (dismissing claims where plaintiff "repeatedly refer[red] to 'defendants' in the aggregate, without attributing specific conduct to any individual defendant").

Plaintiffs argue that PAS was a party to four of the contracts that allegedly were breached and that PAS's president, Marianne Caswell, "walked back" representations that Guardian would invest in Currence and announced at a conference for Guardian agents that Flo would be "going away." The FAC does not, however, allege that PAS breached any of the contracts at issue, and the allegations concerning Caswell do not give rise to liability. Because the FAC does not allege facts about the wrongful conduct of PAS individually, the claims against PAS are dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED in part and DENIED in part**. Plaintiffs' claims for trade secret misappropriation under state law (Count II) and for the breach of implied covenant of good faith and fair dealing (Count IV) are dismissed against all Defendants, and all claims against PAS are dismissed. The following claims against Guardian survive:

- Trade secret misappropriation under the DTSA (Count I),
- Breach of contract (Count III, not a part of this motion),
- Tortious interference with business relations under New Jersey law (Count V),
- Unfair competition (Count VI) and
- Violation of the NJWPL for unpaid commissions (Count VII).

Defendants' motion for oral argument is **DENIED as moot**.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 68 and 85.

Dated: November 23, 2026
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**